UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Loletia Wilson, | ) | CASE NO. 1:11 CV 1681 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Cleveland Clinic Foundation, | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendant. | ) | |

**Introduction**

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 22). This is an employment discrimination case alleging failure to promote based on gender, and suspension and termination based on retaliation. For the following reasons, the motion is GRANTED.

**Facts**

Plaintiff Loletia Wilson filed her Second Amended Complaint against defendant Cleveland Clinic Foundation. The Second Amended Complaint is divided into three categories.  Counts One and Two fall under the heading of failure to promote, and allege that defendant violated federal and state law by failing to promote plaintiff to the Workleader

1

position based on her gender. Counts Three and Four fall under the heading of suspension, and allege that defendant violated federal and state law by suspending plaintiff based on her race and color, and in retaliation for filing an EEOC charge related to the failure to promote claim. Counts Five and Six fall under the heading of termination, and allege that defendant violated federal and state law by terminating plaintiff on the basis of her race and color, and in retaliation for filing the EEOC and the Complaint in this matter. In her brief opposing defendant's Motion for Summary Judgment, plaintiff now states that she is abandoning her claims for race and disability discrimination, and maintaining those for gender and retaliation. Although plaintiff never alleged disability discrimination, the Court acknowledges that plaintiff's existing claims are for gender discrimination and retaliation arising out of failure to promote, suspension, and termination.

### (1) failure to promote

Plaintiff was hired by defendant in May 1997 as a Patient Transporter. According to Jason Petty, Manager of Patient Transportation, the Transportation Department created a new Workleader position in 2010. Petty declares the following in relation to promotions to this position. Due to the number of departmental employees and multiple shifts, the Department elected to hire four individuals into this new position. More than 20 Department employees applied for the position, including plaintiff. The Department considered all applications and conducted interviews with each applicant. Defendant looked at each applicant's skill sets and qualifications such as good work performance, ability to perform job duties, efficiency in transporting patients, good customer service skills, willingness to go above and beyond and take on extra duties and responsibilities. Through the selection process, defendant selected the

four most qualified individuals for the Workleader position, Alphonso Roberson, Herbert Allen, Charles DeBerry, and Steven Knox. Plaintiff did not receive the promotion because she was not the most qualified candidate, and had a long history of Employee Anecdotal Notes and Corrective Actions for both performance and productivity issues.[1]

Defendant took productivity into consideration as one of the many factors considered. The Transportation Department tracks productivity of its first and second shift general pool employees utilizing a computerized system called TeleTracking which receives requests for transports, assigns a transporter from the general pool to the transport, and notifies the transporter and tracks the time intervals. The productivity standards measured through this system are known as Dispatches Per Hour (DPH) or Trips per Hour (TPH). Plaintiff was a second shift general pool employee and was, thus, measured under the DPH or TPH productivity standards. Knox and DeBerry did not have DPH or TPH counts and were not subject to these standards because they worked in dedicated areas and not the general pool. (Perry decl.)

**(2) suspension**

According to plaintiff, on August 26, 2011, she received a call to report to a patient room to transport a deceased patient. Darlene Brooks was also assigned as the lead transporter. Plaintiff entered the room, and Brooks brought the morgue cart in. The two attempted to move the patient but were unable to do so because of the patient's weight.

---

[1] Attached to Petty's declaration are the approximately 22 anecdotal notes and corrective action reports issued by defendant ranging from May 1999 through August 2010, covering attendance issues, failure to follow departmental policies and procedures, and productivity and performance issues. (Ex. 2)

Brooks stated that they were going to need help and plaintiff agreed. Brooks told plaintiff that she was going to step out of the room and call someone, plaintiff "said okay," and Brooks stepped out. Plaintiff attempted to lock the morgue cart but found it was not operating. Plaintiff then went outside the room and saw Brooks talking with the secretary. Plaintiff told Brooks to request a certain type of cart. As plaintiff was talking with the secretary, they heard the body crash. Plaintiff, Brooks, and two nurse managers then went into the room and found the body on the floor. (pltf. depo. 48-55)

Defendant conducted an investigation of the incident. Plaintiff and Brooks completed written statements. Mariselle Caraballo, Manager of Patient Transportation, issued a three-day suspension to plaintiff on September 21, 2011. Caraballo noted on the report that plaintiff failed to follow department processes and protocols, as well as policy, in leaving the patient alone. She noted that the primary transporter had made the decision to get additional help and had instructed plaintiff to stay in place while she exited the room. Plaintiff also exited the room, and the patient rolled off the bed in her absence. (Caraballo depo., Ex. 76) Caraballo testified that Brooks followed the proper protocol by asking plaintiff to wait in the room while she left to get assistance. (Caraballo depo. 20)

**(3) termination**

Caraballo testified that on February 6, 2012, she received an email from a second shift supervisor reporting a complaint from a nurse regarding plaintiff. The email reported that the incident involved a patient who had had vaginal rods placed in her body. The nurse called for additional help in lifting the patient from the cart to the bed, but plaintiff did not wait for the additional help and transferred the patient with the help of a nursing assistant. Caraballo

4

forwarded the email to Jason Petty to investigate as Caraballo had left for the day.  (Caraballo depo. 42, Ex. 75)  According to Petty, an investigation was made of the incident.  The nurse and nursing assistant involved completed written statements.  Caraballo and Petty met with plaintiff on February 8. During the meeting, plaintiff related that the nurse said that she was going to get more help for the transfer.  After waiting in the room, plaintiff decided to transfer the patient, along with the nursing assistant, without the required additional help.  (Caraballo depo., Ex. 74) Following the investigation, Petty advised plaintiff on February 13, 2012, that defendant was terminating her employment.  (Petty decl.)  The termination report states that plaintiff failed to follow department procedure, and admitted to hearing the nurse's instruction but chose to go against procedure because she thought she could perform the lift without the additional help.  (Petty decl. Ex. 4)

This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its

resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) failure to promote (gender discrimination)**

The elements of a prima facie case of gender discrimination in the failure to promote context are well-established.  Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied.  *Culver v. CCL Label, Inc.,* 455 Fed.Appx. (6th Cir. 2012) (citations omitted).  With regard to the second prong, to establish that she is qualified for the position, the plaintiff need only show that she satisfied an employer's "objective qualifications." *Id.* As to the fourth prong, the Court must independently review the relative qualifications of those selected for the position and plaintiff to determine whether "other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Id.*

"Once the plaintiff establishes a prima facie case, the employer bears the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment decision." *Rufo v. Dave & Busters, Inc.,* 2007 WL 247981 (6th Cir. Jan. 31, 2007) (citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377 (6th Cir.2002)). "At this stage and throughout, the burden of persuasion remains with the plaintiff. Finally, the burden switches back to the plaintiff to identify admissible evidence sufficient to create a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.* (citations omitted).

Defendant argues that plaintiff cannot satisfy the fourth element of the prima facie

case, i.e., that a male of similar qualifications received the job.  Rather, defendant contends, the four males selected had greater qualifications than plaintiff. Plaintiff bases her failure to promote claim on the selection of DeBerry and Knox.  Jason Petty declares the following. Plaintiff did not receive the promotion because she was not the best, most qualified candidate for the Workleader position.  She had a long history of Employee Anecdotal Notes and Corrective Actions, for both performance and productivity issues, that show that she does not have characteristics that exude qualification for the Workleader position.  Knox, on the other hand, was very good with patients, always willing to do extra work, take on extra responsibility, exhibited good work performance, and was very good with customers. DeBerry exhibited good work habits, leadership qualities, and experience.  In sum, the four individuals promoted had greater qualifications than plaintiff in terms of overall skill sets, work performance and customer service. (Petty decl. ¶¶ 9-12).

       Plaintiff contends that she was more qualified than Knox and DeBerry. For the following reasons, plaintiff fails to satisfy the fourth prong of the prima facie case.

       Plaintiff point out that she had been employed longer than Knox and DeBerry.  She concludes that they had less experience as transporters than plaintiff. But, as set forth above, the two males were selected based on their superior skill sets and qualifications.  Plaintiff offers no evidence to contradict Petty's declaration regarding their superior qualifications. Plaintiff only assumes that because she had been employed for a longer period of time, she was more qualified. Otherwise, she offers no evidence establishing the requisite levels of experience or qualifications of those considered for the position.  The Court cannot assume that plaintiff had the most experience based upon her length of employment.

Petty also points out plaintiff's history of performance issues which showed that she was not qualified to be a Workleader. While plaintiff asserts that these corrective actions and notes are "clearly irrelevant to the issues before this Court," Petty did consider them relevant in determining whether plaintiff had the qualifications for the position. Plaintiff also seems to dispute the bases for some of the more recent corrective actions, especially those relating to productivity. But the notes and reports ranged from 1999 through 2010 and involved various issues. Petty considered this "long history." This Court cannot substitute its business judgment for defendant's. *See Gulley v. County of Oakland,* 2012 WL 3668001 (6th Cir. Aug. 27, 2012) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir.2000)) ("As we have oft times repeated, 'it is inappropriate for the judiciary to substitute its judgment for that of management.'")

Plaintiff also contends that defendant used "flawed performance standards" relating to TPH which led to her "first termination" and not being selected for the position. Plaintiff's first termination is not a part of this lawsuit. The evidence shows that plaintiff received a Final Written Warning on September 26, 2010, for failure to meet Trips Per Hour (TPH) guidelines. (Petty decl. Ex.2) Plaintiff filed a claim through defendant's Right of Review Process and during its pendency, plaintiff was terminated on October 18, 2010, for her subsequent failure to meet TPH guidelines. Defendant then rescinded the warning and termination because the TPH policy in place at the time of the warning did not conform to the Clinic's Corrective Action policy. (Petty decl.)

Plaintiff was interviewed for the Workleader position on September 27, 2010. (pltf. aff.) It is unclear as to the exact dates of the selections to the position of Workleader. But,

9

while plaintiff seems to assert that defendant retaliated against her for filing a claim with the Right of Review Process, no such claim of retaliation is alleged.

Moreover, plaintiff's argument that defendant's performance standards were "flawed" is not supported. Plaintiff attempts to undermine some of her disciplines for failing to meet trips per hour and other productivity issues by providing explanations for her actions. She also provides the opinion of a co-worker regarding his position on the trips per hour standard. But this is not evidence that the system was flawed. More importantly, as defendant asserts, even if the system were flawed, it applied to all employees, male and female, within the general pool.

Plaintiff states that she was more qualified than Knox and DeBerry when comparing trips per hour. But, as Petty declared, productivity was only one of many factors considered. Therefore, even if she did have more trips per hour, defendant considered other qualifications in making the decision. Furthermore, the comparison is disingenuous. Plaintiff acknowledges that she has always worked in the general pool as a Patient Transporter. (pltf. aff.) Plaintiff also testified that Knox and DeBerry were not subject to the TPH standards because they were in dedicated areas. (pltf. depo. 191-192) Other evidence shows that as a second shift general pool employee, plaintiff was measured under the DPH or TPH productivity standards. Knox and DeBerry did not have DPH or TPH counts available and were not subject to the same productivity standards as plaintiff because they worked in dedicated areas whereas plaintiff worked in the general pool. Because of work flow, only first and second shift general pool employees were held accountable to the DPH or TPH standards. Employees in dedicated areas, such as Knox and DeBerry, did not receive or record their transportation assignments

through the computerized system that tracked DPH or TPH.  (Petty decl.)  Plaintiff does not demonstrate that holding employees to different standards because they do not perform the same functions is discriminatory in any way.

For these reasons, plaintiff fails to show she had similar qualifications or was more qualified than Knox and DeBerry and, therefore, fails to establish a prima facie case.  Even if she did, plaintiff fails to show pretext.

Defendant has stated a non-discriminatory reason for selecting Knox and DeBerry. Namely, they were more qualified than plaintiff. As discussed above, plaintiff fails to dispute this.  Although it is her burden, plaintiff fails to specifically address pretext.  Additionally, plaintiff seems to assert that gender discrimination was the true reason that she was not selected based on the fact that all the positions were awarded to males and Petty testified that although defendant is an equal opportunity employer, no one on the selection committee brought up the fact that four males were promoted while no female was. The fact that only males were selected is, in itself, insufficient to show pretext given that is only an element of the prima facie case which is not disputed.  Rather, the burden falls upon plaintiff, not defendant, to identify admissible evidence from which a reasonable jury could find that defendant's stated reason was a lie contrived to conceal its true reason (that plaintiff is female) for not promoting her.  *Corell v. CSX Transp., Inc.,* 378 Fed.Appx. 496 (6th Cir. 2010).  Plaintiff fails to do so.

Summary judgment is warranted on the failure to promote claim.

**(2) suspension (retaliation)**

To establish a prima facie case of retaliation, plaintiff must present evidence of four

elements: (1) she engaged in a protected activity under Title VII, (2) the exercise of protected rights was known by defendant, (3) defendant took adverse employment action against plaintiff and (4) there was a causal connection between the adverse employment action and the protected activity. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995–96 (6th Cir.2009). If the prima facie case is satisfied, defendant must set forth a non-retaliatory reason for its action. If it does so, plaintiff must show the reason was a pretext for retaliation.

Defendant asserts that plaintiff fails to show a causal connection between her discipline and the charge she filed with the EEOC. Plaintiff filed a charge of discrimination with the EEOC on December 27, 2010. (pltf. depo. Ex. 97) Mariselle Caraballo issued the three-day suspension to plaintiff on September 21, 2011. Therefore, nearly nine months had lapsed between the filing of the charge and the issuance of the suspension. A time lag of seven months normally cannot support an inference of a causal link. *See Dicarlo v. Potter,* 358 F.3d 408 (6th Cir. 2004)

Plaintiff spends nearly eight pages discussing facts which plaintiff asserts indicate that, regardless of the timing of the EEOC charge and the suspension, retaliation is evident because Darlene Brooks, who never filed an EEOC charge, violated a work rule and was not disciplined. In particular, plaintiff asserts that Brooks was at fault and not plaintiff because Brooks entered the room without a nurse in violation of Clinic rules. However, plaintiff was not disciplined for entering the room without a nurse. She was disciplined for exiting the room and leaving the patient unattended. The evidence shows that Brooks, on the other hand, did not leave the room with the patient unattended as plaintiff was asked to wait in the room. Plaintiff's own deposition testimony is that Brooks told plaintiff that she was going to "step

12

out" of the room and look for help and that plaintiff "said okay." Brooks then stepped out of the room. Thus, plaintiff's argument in this regard is unpersuasive.

Plaintiff additionally argues that after she won her reinstatement following her first termination, management "la[id] in weight for their chance" to discipline her and when this incident occurred, "they jumped at the chance and wrongly suspended her." (Doc. 25 at 28) Plaintiff points to Jason Petty's deposition testimony that when asked whether he agreed that plaintiff should have been reinstated following her Right of Review process, he responded, "I don't think it was the right thing to do." (Petty depo. 52) Plaintiff surmises that this feeling "sets Petty up as a driving force for retaliation" and a "reasonable inference is that he waited for the right time." (Doc. 25 at 11-12) This is mere conjecture on plaintiff's part. Even if it were not, Petty was not involved in the decision to suspend plaintiff. (Petty depo. 53-54) Caraballo issued the suspension. (Caraballo depo. Ex. 76)

Additionally, this argument infers that defendant retaliated against plaintiff for filing her Right of Review, an internal Clinic procedure. Filing under the Right of Review policy is not protected Title VII activity and, therefore, cannot be a basis for her retaliation claim.

Finally, plaintiff contends that defendant did not follow its progressive discipline policy "and went straight to a three day suspension." (Doc. 25 at 14) But, defendant asserts that it does not have "progressive discipline." Petty submits the Corrective Action policy which provides, "The step of corrective action may vary depending upon the nature of the infraction, the circumstances surrounding the offense and the employee's past record." (Petty decl. Ex.1) The suspension report noted that plaintiff violated policies that "patients should not be left alone," "unacceptable job performance-performing unsafe procedures," and

13

"actions detrimental to patient safety."  (Caraballo depo. Ex. 76) The latter was identified in the suspension report as a major infraction under two sections of the Corrective Action policy. The policy provides that such an infraction could subject the employee to Step 3 unpaid suspension or Step 4 termination.  (Petty decl. Ex. 1) Thus, not only was defendant's employment decision within its policy, but plaintiff's assertion that it was retaliatory is undermined by the fact that defendant could have terminated her for the infraction rather than merely suspending her.

Plaintiff presents no evidence of a causal connection between filing of the EEOC charge and her suspension nine months later.  On this basis, she fails to establish a prima facie case of retaliation.

Assuming she did, plaintiff fails to establish pretext as she fails to specifically address it. Nonetheless, after an investigation, defendant determined that plaintiff should receive a written warning for leaving the patient unattended and a suspension due to the severity of the incident, while Brooks followed protocol when she left the patient in the room after asking plaintiff to wait in the room while she got assistance.  (Caraballo depo. 19-20) On this basis, defendant has demonstrated "an honest belief in its proffered reason for the adverse employment action" and "the inference of pretext is not warranted" given that defendant has established that it "reasonably relied on particularized facts that were before it at the time the decision was made." *Tibbs v. Calvary United Methodist Church,* 2012 WL 5861725 (6th Cir. Nov. 20, 2012) (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274 (6th Cir. 2012).

For these reasons, summary judgment is warranted on plaintiff's suspension claim.

**(3) termination (retaliation)**

Plaintiff asserts that her February 13, 2012 termination was in retaliation for filing her second EEOC charge on November 4, 2011.  The standard for evaluating a retaliation claim is set forth above.   Defendant argues that plaintiff fails to establish a prima facie case because there is no causal connection between her filing the EEOC charge and the termination.  Nor can plaintiff show pretext.

"In order to establish a causal connection, [plaintiff] must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Taylor v. Geithner*, - f.3d- , 2013 WL 11673 (6th Cir. Jan. 2, 2013) (citations omitted). "Accordingly, at the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *Id.*  One way by which a plaintiff can demonstrate a causal connection is to show a very close temporal proximity between the adverse employment actions and the protected activity. *Id.*

A little more than three months lapsed from the time of filing the EEOC charge and the time of plaintiff's termination.  The Court will assume on this basis that due to the temporal proximity, the prima facie case is satisfied and will proceed to pretext.

Plaintiff argues that the evidence actually shows that she did "nothing wrong" and, therefore, she should not have been terminated.  (Doc. 25 at 28-29)

Plaintiff submits her affidavit which states the following:

(20) On 02/06112 I was assigned to transport a patient from surgery to her room. The patient had cancer and had vaginal rods in place, but I was not informed

15

> about this. In fact, I asked if there were any specific instructions, and was told no. I got to the floor and asked for help. A nursing assistant, Suzetta Page, arrived at the patient's door and the patient was brought in. Page and I waited for 10 minutes for the nurse to show up, and Page complained about the nurse taking so long. Page never told me that the patient had vaginal rods or had come from surgery. When the nurse finally showed up, I asked the nurse for help to move the patient, and the nurse made a face and left the room. Page and I moved the patient to her bed, with no complaint from the patient.
>
> (21) I was impatient waiting for the nurse on 02/06/12 because I had already been fired for trips per hour and the clock was ticking waiting for the nurse. Had I known that this patient was sensitive due to the vaginal rods I would have put my impatience aside.

(Doc. 25, pltf. aff.)   Plaintiff also avers that she did not know of a special procedure for moving a patient with vaginal rods.  (*Id.* ¶ 35)

Mariselle Caraballo testified that on February 6, 2012, she received an email from the second shift supervisor regarding the nurse's complaint which she, in turn, forwarded to Jason Petty as she had left for the day.  (Caraballo depo. 42) A copy of the email is submitted which states that the nurse called the second shift supervisor to report an incident involving plaintiff. The email states that plaintiff brought the patient to the floor from another area where she had had vaginal rods placed in her body and

> the normal procedure when transferring the patient to her bed is to lift the patient off the gurney to the bed.  The RN when entering the room called the front desk for help in the lift, but according to her account [plaintiff] was impatient and rushing the process; [the nurse] stated that she was being unprofessional during the wait period for help.  The nurse never left the room during the encounter. [The nurse] stated that with the help of the [nursing assistant] that was in room, [plaintiff] pulled the patient over without the extra assistance needed.  Once the transition was complete [plaintiff] asked if they needed anything, and [the nurse] replied "No" because she was agitated. [Plaintiff] then left the room.

(Caraballo depo. Ex. 75) Caraballo and Jason Petty met with plaintiff upon plaintiff's return to work on February 8.  (Caraballo depo. 43) On the same date that the interview occurred,

16

Caraballo prepared a written statement for the human resources department regarding the meeting she and Petty had with plaintiff. (*Id.* 50-51) The statement is submitted which states the following:

> On Wednesday, February 8, 2012 Jason Petty and myself meet [sic] with employee Lolita [sic] Wilson regarding an incident that occurred on Monday, February 6th.  We met with Lolita to follow-up on a complaint that we received from a nurse in G71 regarding Lolita's decision to transfer a patient from cart to bed without the additional assistance that was required for the patient to be moved.
>
> Lolita claims that when she arrived with the patient there was no one in the room but later the PCNA showed and the nurse assigned to the patient.  Lolita states that she asked the nurse to help with the transfer but that the nurse said with a negative demeanor "no, I am going to get help" and walked out of the room.  Lolita said that she waited in the room with the PCNA for about 15 minutes for the additional help and since no help had arrived she decided to transfer the patient without help.  I asked whether the PCNA helped and she said yeah, she helped with the feet.
>
> Lolita said that when the nurse returned to the room the patient had already been transferred and that the nurse had an attitude.  When I asked Lolita why she moved the patient after she was told additional help was needed she said that she felt it was safe to move the patient and that she even asked the patient if she was ok and the patient replied, yes.  I informed Lolita that she was asked to wait for assistance due to the patient's medical condition.  Lolita said that the nurses never want to help and she didn't think the nurse was coming back.

(Caraballo depo. Ex. 74)

The nurse completed a written statement, dated February 13, 2012, which describes that she informed plaintiff that more help was needed for the transfer but that plaintiff insisted she could do it without additional help.  While the nurse was on the phone requesting assistance, plaintiff and the assistant moved the patient. (Petty decl. Ex. 3)[2]

Jason Petty avers that he was part of the investigation and interview, and "determined

---

[2] Plaintiff states that she completed a written statement on February 9, 2012, and identifies it as Ex. 114.  The Court is unable to locate that exhibit.

17

that [plaintiff] violated Clinic policies warranting the termination of her employment.  The Clinic terminated [plaintiff's] employment for her unacceptable job performance which caused or contributed to unsafe conditions or unsafe procedures as a result of failing to abide by the nurse's instruction to wait for additional help and her decision to move the patient herself."  (Petty decl. ¶ 16) The Employee Corrective Action Report terminating plaintiff's employment is dated February 13, 2012.  (Petty decl. Ex. 4) The report states that plaintiff failed to follow the department procedure for conducting the lift, and that she "admitted to hearing the nurse's instruction and chose to go against procedure because she thought she could perform the lift without the additional help."  (*Id.*)

As with her suspension, defendant reasonably relied on particularized facts that were before it at the time the decision was made.  Caraballo received the email regarding the nurse's complaint and forwarded it to Petty.  Petty and Caraballo interviewed plaintiff where she admitted that the nurse said she was going to get help for the transfer and that plaintiff, becoming impatient with the wait, transferred the patient without help.  Plaintiff argues that the evidence shows there was no written procedure for this transfer and that plaintiff did not know of the patient's specific condition.  But plaintiff was terminated for disregarding the nurse's instruction to wait for additional help and even plaintiff's affidavit states that she was impatient waiting for the nurse.

Plaintiff contends that investigatory statements were taken after the decision was made.  However, the nurse's statement was completed on the day plaintiff was terminated.  While the nursing assistant's statement was completed on February 16, 2012, after plaintiff was terminated, it is in accord with the nurse's version of the events.  The assistant stated,

18

> Transporter was told by the nurse not to move the patient, transporter said we can do this slid her over but the nurse said no wait until we get more help.  Trans. and nurse were talking back and forth.  Trans. grip the sheet and said let['s] go one, two, three and she put the patient over.  I grabbed the patient['] legs.  The nurse was very upset...

(Petty decl. Ex. 3) Thus, the nursing assistant's statement actually supports defendant's reason for terminating plaintiff.

For these reasons, plaintiff fails to show pretext.

For the foregoing reasons, there is no genuine issue of material fact as to any of plaintiff's three claims.

### Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

      /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/28/13